1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

PATRICK WILLIAM GONZALES,

              Plaintiff,

     v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

              Defendant.

_____/

Case No. 1:20-cv-01530-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.    INTRODUCTION

      On October 29, 2020, Plaintiff Patrick William Gonzales ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI) under the Social Security Act (the "Act"). (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were

---

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II.      BACKGROUND

Plaintiff was born on April 9, 1966, completed eleventh grade, can communicate in English, and previously worked as a laborer, farm machine operator, and forklift operator.  (Administrative Record ("AR") 26, 47, 48, 50, 67, 84, 87, 104, 105, 109, 122, 125, 138, 289, 292, 294, 295, 301, 347, 381, 462.)  Plaintiff filed claims for DIB and SSI payments on January 9, 2018, and January 12, 2018, respectively, alleging he became disabled on September 1, 2016, due to right shoulder dislocation with torn ligaments, diabetes, high blood pressure, kidney cancer, enlarged heart, high cholesterol, depression, and possible lung cancer.  (AR 15, 67, 68, 87, 88, 109, 110, 125, 126, 160, 289, 293, 347, 381.)

**A.      Relevant Medical Evidence[3]**

**1.      Physical Medical Evidence of Record**

In July 2017, Plaintiff presented to the emergency department complaining of neck and right shoulder pain following a motor vehicle accident.  (AR 407–26.)  An examination showed "[m]idline neck tenderness," "[l]eft chest wall contusion," and "[o]bvious right shoulder deformity with skin tear over the right elbow."  (AR 408.)  X-rays of his right shoulder revealed dislocation, and he underwent a closed reduction of his right shoulder dislocation.  (AR 408, 409.)  A CT of Plaintiff's cervical spine showed "likely positional" scoliosis with no definite fracture.  (AR 412, 422.)  A few weeks later, it was noted that Plaintiff could not move his right shoulder more than five percent in every direction.  (AR 443.)  An examination performed in late September 2017 revealed extreme discomfort with attempted range of motion of Plaintiff's right shoulder, some swelling in his right hand, no shoulder tenderness, full range of motion of his right elbow, and difficulty making a full fist with his right hand.  (AR 441.)

One month later, Plaintiff reported that he was feeling "a little bit better" with improved neurological symptoms, although he still had "profound weakness with his right shoulder" and an

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 10.)

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

inability to elevate it.  (AR 438.)  An MRI of the right shoulder noted a massive rotator cuff tearing with retraction back to the level of the glenohumeral joint associated with muscular atrophy, which the provider observed "would suggest a chronic nature to this injury."  (AR 432, 438.)  The provider noted his concern that Plaintiff "has an injury to the shoulder which is not repairable . . . Based on the level of muscular atrophy and the amount of retraction of the tendons and concerned that this tear will not be fixable."  (AR 438.)  The provider indicated his plan to "send the patient to a shoulder specialist as soon as possible for evaluation and recommendations with regard to the appropriate management of the shoulder."  (AR 438.)  In November 2017, Plaintiff underwent an orthopedic consultation.  (AR 431–32.)  The orthopedic surgeon diagnosed a "[c]uff tear arthropathy involving the right shoulder with significant rotator cuff retraction and atrophy."  (AR 432.)  The surgeon opined that the rotator cuff "was not salvageable," and that reverse shoulder replacement was indicated.  (AR 432.)

In April 2018, an examination of Plaintiff's right shoulder showed a range of motion up to 90 degrees with pain, no impingement or instability, positive signs of bursitis and tendonitis, and normal neurovascular findings.  (AR 573.)  He was assessed with right rotator cuff arthropathy and an irreparable rotator cuff tear.  (AR 573.)  Plaintiff reported "doing well" with Tylenol and wished to delay injection or surgery at that time.  (AR 573.)

An examination performed in June 2018 by Robert E. Caton, M.D., revealed "significant pain" and tenderness in Plaintiff's right shoulder tenderness with reduced range of motion; decreased sensation about the skin secondary to the dislocation of the shoulder; significant degree of adhesive capsulitis; neck tenderness at C6–7; neck pain with range of motion; decreased sensation about the right shoulder in a C5 dermatome pattern; low back tenderness; difficulty squatting; and difficulty getting on and off the examination table.  (AR 578–79.)  Dr. Caton gave Plaintiff Tramadol for pain and Tizanidine as a muscle relaxant.  (AR 582.)  He agreed with previous assessments that Plaintiff would eventually require surgery.  (AR 582.)

At a follow up appointment with Dr. Caton in August 2018, an examination demonstrated similar findings.  (AR 584–86.)  An MRI of Plaintiff's cervical spine revealed mild to moderate multilevel osteophytes and disc bulging.  (AR 585.)  An MRI of the lumbar spine was also

abnormal, showing mild disc bulging at multiple levels, as well as moderate central and severe lateral disc height loss with prominent bulging disc osteophyte complex at the L5–S1 level with moderate neural foraminal narrowing and contact of the exiting right L5 nerve roots.  (AR 585–86.)  Dr. Caton administered an injection to Plaintiff's right shoulder.  (AR 586–87.)

In October 2018, Dr. Caton's examination of Plaintiff showed right shoulder pain with decreased abduction, poor abduction strength, and an inability to place his hand behind his head or behind his back with a painful arc of motion, but otherwise intact motor tone and sensation.  (AR 592.)  An examination of Plaintiff's neck revealed persistent pain with decreased motion and painful arc of motion.  (AR 592.)  It was noted that Plaintiff, "on a probable basis," is going to require surgery to repair his right rotator cuff, a cervical steroid injection, and injection therapy for his low back.  (AR 593–94.)  An examination of Plaintiff performed in December 2018 showed decreased range of motion of the right shoulder and tenderness in the rotator cuff area, with grossly intact motor and sensory examination.  (AR 680.)  He was given a refill of Tramadol.  (AR 681.)

Plaintiff began undergoing physical therapy in January 2019.  (AR 595–96.)  In May 2019, an examination demonstrated decreased range of motion of Plaintiff's right shoulder and grossly intact motor and sensory examination.  (AR 610.)  He was given a refill of Tizanidine.  (AR 610.)

### 2.  Psychiatric Medical Evidence of Record

In January 2017, Plaintiff reported that he stopped taking his antidepressant because it was "too strong" and made him feel "worse and dizzy."  (AR 451.)  The provider noted Plaintiff was alert and interactive with normal affect and was "[d]oing some what [sic] better."  (AR 451.)

Plaintiff underwent a consultative psychological evaluation performed by Ekram Michiel, M.D., in March 2018.  (AR 461–64.)  Plaintiff reported feeling tense throughout the day with episodic panic attacks.  (AR 462.)  Plaintiff further reported that he is always worried, gets easily frustrated, and is moody.  (AR 462.)  According to Plaintiff, he is able to take care of his personal hygiene and rides his stationary bike seven miles a day.  (AR 462.)

Upon examination, Dr. Michiel noted Plaintiff's unkempt appearance, poor hygiene, hyperventilation, a "depressed" mood with an intense and anxious affect, no suicidal ideation, and normal thought processes and content.  (AR 463.)  Plaintiff had normal orientation but impaired

attention and concentration.  (AR 463.)  Dr. Michiel noted Plaintiff was able to do simple math calculations and exhibited normal judgment and insight, but his remote memory was impaired. (AR 463.)

During Plaintiff's diabetes follow up appointments in April 2018 (AR 724), May 2018 (AR 697), December 2018 (AR 680), February 2019 (AR 668), and April 2019 (AR 629), his physical exams showed that he was "[a]lert and interactive with normal affect."

**3.    Opinion Evidence**

In March 2018, L. Zuniga, M.D., a state agency physician, reviewed the record and assessed Plaintiff's physical residual functional capacity (RFC).[4]  (AR 79–80, 99–100.)  Dr. Zuniga found that Plaintiff could lift and/or carry occasionally 20 pounds and frequently 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform unlimited pushing and pulling, subject to the above lift-and-carry restrictions; and perform limited right overhead reaching.  (AR 79–80, 99–100.)  Upon reconsideration in May 2018, another state agency physician, Yvonne Post, D.O., reviewed the record, affirmed Dr. Zuniga's findings, and added the additional limitations of occasional crawling and climbing of ladders, ropes, and scaffolds.  (AR 119–121, 135–37.)

In March 2018, state agency physician S. Khan, Ph.D., reviewed the record and assessed Plaintiff's mental RFC.  (AR 82–83, 102–03.)  Dr. Khan opined that Plaintiff was able to: understand and remember simple instructions; sustain attention and concentration for two-hour periods to complete a regular workday at an acceptable pace and attendance schedule; interact adequately in casual settings and respond appropriately to constructive instructions; and respond to simple /infrequent changes in routine.  (AR 83, 103.)  Dr. Khan further found that Plaintiff was not precluded from public contact.  (AR 83, 103.)  Upon reconsideration in April 2018, another

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

state agency physician, K. Gregg, M.D., reviewed the record and deemed Plaintiff's depression and anxiety disorders non-severe.  (AR 115–16.)

Dr. Caton opined in October 2018 that Plaintiff would require restrictions of no repetitive motion of the right shoulder; no lifting above the horizontal; no repetitive motion with the neck; no heavy lifting, pushing, or pulling more than 10 lbs.; and no climbing of ladders.  (AR 594.)

Following his examination of Plaintiff in March 2018, consultative psychiatrist Dr. Michiel opined that Plaintiff is "unable to maintain attention and concentration to carry out simple job instructions due to his depression and anxiety."  (AR 464.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on March 21, 2018, and again on reconsideration on May 3, 2018.  (AR 147–56, 160–64.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 165–80.)  The ALJ conducted a hearing on May 7, 2020.  (AR 34–66.)  Plaintiff appeared at the hearing with his counsel and testified as to his alleged disabling conditions and work history.  (AR 43–59.)

**1.    Plaintiff's Testimony**

He testified that he currently works as a maintenance person for a 160-home mobile home facility, making sure the grounds are clean, pulling weeds, and tending to the swimming pool (AR 43–45, 54, 57.)  According to Plaintiff, he does not lift more than five pounds and uses a golf cart at work.  (AR 44, 54.)  He works four hours a day, three of which are spent standing or walking.  (AR 45.)  Plaintiff testified that he was "lucky" to get the job from Craigslist.  (AR 45.)  His current boss is not happy with his pace of work activity, which has caused conflict.  (AR 57.)  Prior to his maintenance position, he was a forklift operator, a farm machine operator, and a mason.  (AR 46–50.)

Plaintiff's wife prepares his meals, does the grocery shopping, and the household chores.  (AR 51.)  Plaintiff stated that when he comes home from work, he takes a pain pill, sits in his recliner, and goes to bed by 6:00 p.m.  (AR 51, 52–53.)  Plaintiff testified that he could sit for two hours before needing to change positions.  (AR 52.)

According to Plaintiff, his neck and back prevent work activity and his anxiety makes him unable to think or "process." (AR 54, 56.) Plaintiff testified that his shoulder pain is "constant" and "ongoing" and that he feels "fire" in his arm every day. (AR 58.) He treats his pain with medication and takes muscle relaxants for cramps he gets in his shoulder. (AR 58.) According to Plaintiff, the medication causes side effects such as dizziness. (AR 58.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing that Plaintiff had past work as an forklift operator, Dictionary of Operational Titles (DOT) code 921.683-050, which was medium work (light as performed), with a specific vocational preparation (SVP)[5] of 3; as a cement mason, DOT code 844.364-010, heavy work, with an SVP of 7; as a farm machine operator, DOT 409.683-010, heavy work (medium as performed), with an SVP of 3; and as a janitor, DOT code 382.664-010, medium work (light as performed), with an SVP of 3 (SVP of 2 as performed). (AR 60–61.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work experience and posed a series of hypotheticals about this person. (AR 61.) The VE was to assume this person: can lift or carry 20 pounds occasionally and ten pounds frequently; could stand or walk about six out of eight hours; could sit about six out of eight hours; can only occasionally climb ramps or stairs; and can occasionally crawl and reach overhead with their dominant upper extremity. (AR 61.) The VE testified that such a person could perform Plaintiff's past relevant work as a forklift operator and janitor as performed. (AR 61.)

The ALJ asked the VE, in a second hypothetical, to consider the individual presented in the first hypothetical but that such person would be limited simple and routine tasks and routine work-related decision making, *i.e.*, jobs that have a reasoning level of 1 or 2. (AR 61.) The VE testified that such a person could perform Plaintiff's past relevant work as a janitor as performed, and could perform other jobs in the national economy, such as cleaner, DOT code 323.687-014, light work, with an SVP of 2; cashier, DOT code 211.462-010, light work, with an SVP of 2; and sales

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

1  attendant, DOT code 299.677- 010, light work, with an SVP of 2.  (AR 61–62.)

2       For a third hypothetical, the ALJ asked the VE to consider an individual who: can lift or

3  carry 20 pounds occasionally and ten pounds frequently; could stand or walk about six out of eight

4  hours; could sit for about six out of eight hours; could occasionally climb ramps or stairs; could

5  occasionally crawl and reach with their dominant extremity; could never lift with the dominant

6  upper extremity above chest height; and is limited to simple and routine tasks and routine work-

7  related decision making.  (AR 62.)  The VE testified that such limitation would preclude all work.

8  (AR 62.)

9       Plaintiff's attorney posed a hypothetical involving a person who: could lift no more than

10 ten pounds; never perform repetitive motion of the dominant right shoulder; never lift the right arm

11 above horizontal; and never perform repetitive motion of the neck.  (AR 62–63.)  The VE testified

12 that there would be no work such a person could perform.  (AR 63.)  Plaintiff's attorney posed a

13 second hypothetical involving a person who would be off task 15% of the workday; the VE

14 responded that no work would be available.  (AR 63.)  Finally, Plaintiff's attorney posed a third

15 and final hypothetical involving a person who would be unable to complete an eight-hour workday

16 two days a week.  (AR 63.)  The VE testified that there would be no work such a person could

17 perform.  (AR 63.)

18 **C.      The ALJ's Decision**

19      In a decision dated June 3, 2020, the ALJ found that Plaintiff was not disabled, as defined

20 by the Act.  (AR 15–18.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R.

21 §§ 404.1520, 416.920.  (AR 17–28.)  The ALJ decided that Plaintiff met the insured status

22 requirements of the Act through September 30, 2017, and he had not engaged in substantial gainful

23 activity since September 1, 2016, the alleged onset date (step one).  (AR 17.)  At step two, the ALJ

24 found Plaintiff's following impairments to be severe: degenerative joint disease; degenerative disc

25 disease; obesity; and anxiety.  (AR 18.)  Plaintiff did not have an impairment or combination of

26 impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

27 Subpart P, Appendix 1 ("the Listings") (step three).  (AR 18–21.)

28

The ALJ then assessed Plaintiff's RFC and applied the assessment at steps four and five. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967(b), but with the following specific limitations: [Plaintiff] can lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for about six hours each in an eight-hour workday; occasionally climb ramps and stairs; occasionally crawl; occasionally reach overhead with the dominant upper extremity; and is limited to simple and routine tasks, as well as routine work-related decision making.

(AR 21–25.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (AR 22.)

The ALJ determined that, given his RFC, Plaintiff could not perform his past relevant work (step four), but that he could perform a significant number of other jobs in the local and national economies, specifically cleaner, cashier, and sales attendant (step five).  (AR 25–27.)  Ultimately, the ALJ concluded that Plaintiff was not disabled from September 1, 2016, through the date of his decision.  (AR 27–28.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on August 25, 2020.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

## III.     LEGAL STANDARD

### A.     Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [their] physical or

mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

1   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

2   305 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla but less than a

3   preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

4       "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.*

5   *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed

6   only if that decision is not supported by substantial evidence or it is based upon legal error."

7   *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the

8   ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*;

9   *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible

10  to more than one rational interpretation, the court may not substitute its judgment for that of the

11  Commissioner.") (citations omitted).

12      In reviewing the Commissioner's decision, the Court may not substitute its judgment for

13  that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court

14  must determine whether the Commissioner applied the proper legal standards and whether

15  substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v.*

16  *Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be

17  affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at

18  1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must

19  'consider the record as a whole, weighing both evidence that supports and evidence that detracts

20  from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.

21  1993)).

22      Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

23  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

24  454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record

25  that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

26  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins*, 466 F.3d at 885).

27  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the

28  agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

///

# IV.   DISCUSSION

Plaintiff contends the ALJ erred in failing to properly articulate the reasons for rejecting the opinions of Plaintiff's "treating" physician Dr. Caton as well as that of the consultative examiner Dr. Michiel.  He also contends the ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's subjective-symptom testimony.  Plaintiff therefore requests this Court remand for further proceedings.  (Docs. 21, 25.)

The Commissioner contends that the ALJ reasonably considered Drs. Caton's and Michiel's opinions, and that substantial evidence supports the ALJ's evaluation of Plaintiff's symptoms.  (Doc. 24.)

Because further proceedings are required regarding the opinions of Drs. Caton and Michiel, the Court does not reach the subjective-symptom-testimony issue.[6]

## A.   Legal Standard

On January 18, 2017, the Social Security Administration published revisions to its regulations regarding the evaluation of medical evidence.  *See* REVISIONS TO RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844-01, 2017 WL 168819 (January 18, 2017).  For applications, like Plaintiff's, filed on or after March 27, 2017, the new regulations state an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, an ALJ is to evaluate opinions by considering their "persuasiveness."  *Id*.  In determining how "persuasive" the opinion of a medical source is, an ALJ must consider the following factors: supportability, consistency, treatment relationship, specialization, and "other factors."  § 404.1520c(b), (c)(1)–(5); § 416.920c(b), (c)(1)–(5).  Despite a requirement to "consider" all factors, the ALJ's duty to articulate

---

[6] *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Rendon G. v. Berryhill*, No. EDCV 18-0592-JPR, 2019 WL 2006688, at *8 (C.D. Cal. May 7, 2019); *Harris v. Colvin*, No. 13-cv-05865 RBL, 2014 WL 4092256, at *4 (W.D. Wash. Aug. 11, 2014); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

1   a rationale for each factor varies.  § 404.1520c(a)–(b); § 416.920c(a)–(b).

2        In all cases, an ALJ must at least "explain how [they] considered" the supportability and

3   consistency factors, as they are "the most important factors."  §§ 404.1520c(b)(2), 416.920c(b)(2).

4   For supportability, the regulations state: "[t]he more relevant the objective medical evidence and

5   supporting explanations presented by a medical source are to support his or her medical opinion(s)

6   or prior administrative medical finding(s), the more persuasive [the opinion or finding] will be."

7   §§ 404.1520c(c)(1), 416.920c(c)(1).  For consistency, the regulations state: "[t]he more consistent

8   a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

9   medical sources and nonmedical sources in the claim, the more persuasive [the opinion or finding]

10  will be."  §§ 404.1520c(c)(2), 416.920c(c)(2).  The ALJ is required to articulate findings on the

11  remaining factors (relationship with claimant, specialization, and "other") only when "two or more

12  medical opinions or prior administrative medical findings about the same issue" are "not exactly

13  the same," and both are "equally well-supported [and] consistent with the record."   §

14  404.1520c(b)(2), (3); § 416.920c(b)(2), (3).   Finally, the regulations allow an ALJ to address

15  multiple opinions from a single medical source in one analysis.   §§ 404.1520c(b)(1),

16  416.920c(b)(1) ("source-level articulation").

17  **B.    Analysis**

18        **1.    Whether the "Specific and Legitimate" Standard Still Applies**

19        As an initial matter, the parties disagree about the relevance of current Ninth Circuit case

20  law in light of the amended regulations.  Specifically, the parties dispute whether an ALJ is still

21  required to provide specific and legitimate reasons for discounting a contradicted opinion from a

22  treating or examining physician.  (*See* Doc. 21 at 17–18; Doc. 24 at 10.)

23        The Commissioner contends that the new regulations change the standard for rejecting

24  medical providers' opinions.  (Doc. 24 at 8–10.)  Specifically, the Commissioner contends that the

25  new regulations eliminate a hierarchy among medical opinions, superseding any priority upon

26  which the Ninth Circuit's current standards were based, including the specific and legitimate

27  reasons standard.  (*See id.* at 10.)  The Commissioner further contends that the new regulations no

28  longer require an ALJ to reject an opinion at all, but instead require an ALJ merely to address the

1    persuasiveness of the opinion. (*See id*. at 8–9.)

2          Under current Ninth Circuit law, an ALJ must provide "clear and convincing" reasons to
3    reject an uncontradicted opinion from a treating or examining doctor, and "specific and legitimate"
4    reasons to reject a contradicted opinion from such doctor.  *Lester v. Chater*, 81 F.3d 821, 830-31
5    (9th Cir. 1995).  The regulations applicable to applications filed before March 27, 2017, set forth a
6    hierarchy for treatment of opinion evidence that, consistent with Ninth Circuit case law, gives
7    treating sources more weight than non-treating sources, and examining sources more weight than
8    non-examining sources.  *See* STANDARDS FOR CONSULTATIVE EXAMINATIONS AND EXISTING
9    MEDICAL EVIDENCE, 56 Fed. Reg. 36,932, 1991 WL 142361 (Aug. 1, 1991); *Magallanes v. Bowen*,
10   881 F.2d 747, 751 (9th Cir. 1989) (adopting the "clear and convincing" and "specific and
11   legitimate" standards for rejecting treating and examining source medical opinions); *Murray v.*
12   *Heckler*, 722 F.2d 499, 502 (9th Cir. 1983) (holding that "[i]f the ALJ wishes to disregard the
13   opinion of the treating physician, he or she must make findings setting forth specific, legitimate
14   reasons for doing so that are based on substantial evidence in the record"); *see also Thomas S. v.*
15   *Comm'r of Soc. Sec*., No. C20-5083 RAJ, 2020 WL 5494904, at *2 (W.D. Wash. Sept. 11, 2020)
16   (noting that the "hierarchy [for treatment of medical opinion evidence] underpinned the
17   requirement in the Ninth Circuit that an ALJ must provide clear and convincing reasons to reject
18   an uncontradicted doctor's opinion and specific and legitimate reason where the record contains
19   contradictory opinion").

20         In 2017, as set forth above, the Commissioner revised agency regulations to eliminate the
21   hierarchy of medical opinions.  The Ninth Circuit has not yet addressed whether or how the new
22   regulations alter the standards set forth in prior cases for rejecting a medical opinion.  *See, e.g.,*
23   *Titus L.S. v. Saul*, No. 2:20-cv-04825-AFM, 2021 WL 275927, at *6 (C.D. Cal. Jan. 26, 2021)
24   (noting that "it is not clear whether the Ninth Circuit precedent requiring that an ALJ provide 'clear
25   and convincing' or 'specific and legitimate reasons' before rejecting a treating source's medical
26   opinions remain viable"); *Allen T. v. Saul*, No. EDCV 19-1066-KS, 2020 WL 3510871, at *3 (C.D.
27   Cal. June 29, 2020) ("It remains to be seen whether the new regulations will meaningfully change
28   how the Ninth Circuit determines the adequacy of an ALJ's reasoning and whether the Ninth

Circuit will continue to require that an ALJ provide 'clear and convincing' or 'specific and legitimate reasons' in the analysis of medical opinions, or some variation of those standards."); *Thomas S.,* 2020 WL 5494904, at *2 ("The Ninth Circuit has not yet stated whether it will continue to require an ALJ to provide 'clear and convincing' or 'specific and legitimate' reasons for rejecting medical opinions given the Commissioner's elimination of the hierarchy.").  Nevertheless, the new regulations still require the ALJ to explain their reasoning for discounting a medical opinion from a treating or examining physician to allow for meaningful judicial review.  *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a); *see also Scott D. v. Comm'r of Soc. Sec.*, No. C20-5354 RAJ, 2021 WL 71679, at *4 (W.D. Wash. Jan. 8, 2021) (noting that "[e]ven under the Commissioner's new regulations, the ALJ must articulate why he has rejected the opinion" and that "the Ninth Circuit's 'specific and legitimate standard' is merely a benchmark against which the Court evaluates that reasoning"); *Titus L.S.*, 2021 WL 275927, at *7 (noting that "the Commissioner's new regulations still require the ALJ to explain his or her reasoning and to specifically address how he or she considered the supportability and consistency of the opinion" and "even assuming that the Ninth Circuit's more stringent requirements are inapplicable here, the Court still must determine whether the ALJ adequately explained how he considered the supportability and consistency factors relative to the physicians' opinions and whether the reasons were supported by substantial evidence"); *Thomas S.*, 2020 WL 5494904, at *2 ("The Commissioner's new regulations still require the ALJ to explain his or her reasoning, and to specifically address how he or she considered the supportability and consistency of the opinion" and that "[o]bviously, the ALJ's reasoning must remain legitimate, meaning lawful or genuine.").  Furthermore, the Court must continue to consider whether the ALJ's decision is supported by substantial evidence.  *See Amanda W. v. Comm'r of Soc. Sec..*, No. 6:20-CV-00707-YY, 2021 WL 6134369, at *8 (D. Or. Dec. 29, 2021) (citing REVISIONS TO RULES, 82 Fed. Reg. 5844-01 at *5852 ("Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision.")); *see also* 42 U.S.C. § 405(g).

Therefore, based on the above considerations, the Court will determine whether the ALJ

1  adequately addressed the persuasiveness, including the supportability and consistency, of Dr.

2  Caton's and Dr. Michiel's opinions, and whether such assessment is supported by substantial

3  evidence.

4      **2.      Dr. Caton's and Dr. Michiel's Opinions**

5      Plaintiff alleges error in the ALJ's analysis of Dr. Catron's and Dr. Michiel's opinions,

6  contending the ALJ essentially ignored large portions of the record regarding Plaintiff's shoulder,

7  neck, back, anxiety, and depression, and failed to link other portions to his opinion.  Plaintiff further

8  contends the ALJ's reliance on his work history is misplaced because the record shows his current

9  job is limited as performed.  The Court agrees with Plaintiff, and finds the ALJ impermissibly

10 cherry-picked the record and failed to link such evidence to his analysis when considering the

11 supportability and consistency of these opinions.  This results in a decision that is not based on

12 substantial evidence.

13     Plaintiff submitted an October 2018 opinion from Dr. Caton assessing the following work-

14 related limitations: no repetitive motion of the right shoulder; no lifting above the horizontal; no

15 repetitive motion with the neck; no heavy lifting, pushing, or pulling more than 10 lbs.; and no

16 climbing of ladders.  (AR 594.)  The ALJ found Dr. Caton's opinion "partially persuasive,"

17 explaining:

18     [T]he subsequent evidence of record is more consistent with restrictions to a reduced
       range of light work.  As noted above, in May of 2019, an examination demonstrated
19     decreased range of motion of the right shoulder and otherwise intact motor and
       sensory findings.  Moreover, at the hearing, [Plaintiff] testified that he is currently
20     working as a maintenance person at a mobile home park, working four hours a day.
       He stated that he is on his feet three hours a day and that his duties include pulling
21     weeds, picking up trash, and tending to the swimming pool.

22 (AR 24 (internal citation omitted).)  Further, the ALJ found the opinion of Dr. Michiel

23 "unpersuasive," stating:

24     Although his assessment is supported with the objective findings of his evaluation,
       the subsequent evidence of record is more consistent with the ability to perform
25     unskilled work.  As noted above, treatment records from throughout 2018 and early
       2019 consistently noted alert and interactive behavior with a normal affect.
26     Moreover, at the hearing, [Plaintiff] testified that he is currently working as a
       maintenance person at a mobile home park, working four hours a day. He stated that
27     his duties include pulling weeds, picking up trash, and tending to the swimming
       pool.
28

1   (AR 25 (internal citation omitted).)

2          The Court finds that the ALJ's resolution of these opinions demonstrates an attempt to

3   cherry-pick facts and, as to those facts picked, a failure to articulate a nexus between them and the

4   ALJ's persuasiveness analysis. *See* 42 U.S.C. § 423(d)(5)(B) (requiring an ALJ base the decision

5   on "all the evidence available in the [record]."); *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir.

6   2014) (the court may not affirm where the ALJ "pick[ed] out a few isolated instances of

7   improvement" to support the denial of benefits); *Magallanes*, 881 F.2d at 753 (The ALJ should

8   "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating

9   his interpretation thereof, and making findings."); *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th

10  Cir. 1988) ("To say that the medical opinions are not supported by sufficient objective findings or

11  are contrary to the preponderant conclusions mandated by the objective findings does not achieve

12  the level of specificity our prior cases have required . . . .").

13         As of the date of this order, the Court is not aware of any circuit court addressing whether

14  ALJ's are now allowed to cherry-pick the record in making a supportability or consistency finding,

15  or what kinds of findings explicitly constitute cherry-picking under the new regulations.  Numerous

16  district courts across the country have remanded, however, where evidence supporting or consistent

17  with a rejected medical opinion was ignored.  *See Buethe v. Comm'r of Soc. Sec*., No. 2:20-CV-

18  552-KJN, 2021 WL 1966202, at *5 (E.D. Cal. May 17, 2021) (collecting cases).[7] Here, as in those

19  cases, there is ample "objective medical evidence" (20 C.F.R. §§ 404.1502(f), 416.902(k)) in the

20  record, from Plaintiff's "medical sources" (§§ 404.1502(d), 416.902(i)), that stretches across a

21  lengthy treatment period and appears to support the more limiting aspects of the two physicians'

22  opinions (Drs. Caton and Michiel)—evidence the ALJ (at best) failed to connect to their

23  persuasiveness findings or (at worst) willfully ignored.  The ALJ partially discounted Dr. Caton's

24

---

[7] In contrast to these cases, other district courts have found it entirely appropriate for an ALJ to articulate a cursory
25  rationale on the supportability and consistency factors where there was no evidence in the record to support a medical
opinion. *See, e.g., Olson v. Saul*, 20-cv-672-JDP, 2021 WL 1783136, at *2 (W.D. Wis. May 5, 2021) (recognizing
26  that the ALJ "may not ignore evidence that undermines her conclusions," but finding that plaintiff "doesn't point to
any such evidence."); *Paula J.S., v. Comm'r*, No. 2:20-CV-1002-DWC, 2021 WL 1019939, at *4 (W.D. Wash. Mar.
27  17, 2021) ("Plaintiff claims the ALJ cherry-picked the record[, but] does not point the Court to any examples of alleged
omissions."); *Jones v. Berryhill*, 392 F. Supp. 3d 831, 339 (M.D. Tenn. 2019) (affirming ALJ's finding that physician's
28  opinion was unpersuasive because it was "not supportable or consistent with the record," where there was no evidence
in the entire case record supporting the physician's opinion).  Such is not the case here, as explained below.

17

opinion because the "subsequent evidence of record is more consistent with restrictions to a reduced range of light work."  For this finding, the ALJ cites to a single page from the 780-page administrative record: a May 2019 treatment note indicating Plaintiff's neurological examination showed "[d]ecreased range of motion of the right shoulder "and "[g]rossly intact motor and sensory" findings.  (AR 610.)  The ALJ does not explain how this single treatment note regarding Plaintiff's shoulder and neurological findings undermines the functional limitations opined by Dr. Caton, including, for example, those concerning Plaintiff's neck.  To the extent that the ALJ suggests that Plaintiff's conditions have improved since Dr. Caton's opinion, the cited treatment note undermines this conclusion, as the finding of decreased range of motion in Plaintiff's right shoulder appears to be ***consistent*** with the restrictions opined by Dr. Caton.  (*See* AR 593.)

Laboratory findings from mid-2018 clearly show abnormal results with respect to Plaintiff's right shoulder, cervical spine, and lumbar spine.  (*See, e.g*., AR 432, 438, 585–86.)  The ALJ appears to recognize this, noting multiple records documenting these abnormalities in their summary of the medical evidence.  (*See* AR 22.)  Other objective medical evidence in the record, mentioned elsewhere in the opinion but <u>not</u> in conjunction with the ALJ's persuasiveness analysis, also appear to support Dr. Caton's opined limitations, demonstrating right rotator cuff arthropathy, an irreparable rotator cuff tear, significant degree of adhesive capsulitis, neck pain with limited range of motion, scoliosis, decreased sensation about the right shoulder, low back tenderness, difficulty squatting, and difficulty getting on and off the examination table.  (AR 412, 422, 573, 578–79.)  However, there is no connection between any of this evidence and the ALJ's resolution of Dr. Caton's opinion—only a finding that the "subsequent evidence of record is more consistent with restrictions to a reduced range of light work" predicated on a single treatment record.  *See, e.g., Mark M. M. v. Saul*, No. CV 19-107-M-KLD, 2020 WL 2079288, at *5 (D. Mont. Apr. 29, 2020) (finding the ALJ failed to "link purportedly inconsistent evidence with the discounted medical opinion," relying on *Embrey* and *Magallanes*).

As to the ALJ's consideration of Dr. Michiel's opinion, the subsequent evidence of record is characterized as "more consistent with the ability to perform unskilled work."  This conclusion is based on Plaintiff's "treatment records from throughout 2018 and early 2019 [that] consistently

noted alert and interactive behavior with a normal affect."  The ALJ's discussion of these treatment records, however, amount to citing repeatedly the same five pages of the record.  (*See* AR 19, 20, 23, & 25 citing AR 629, 668, 680, 697, & 724.)  These five pages are from the internist's office who Plaintiff was seeing for treatment of his diabetes, kidney cancer, and right shoulder pain, and include a single "psychiatric" finding as part of a ***physical*** examination.  (*See* AR 629, 668, 680, 697, & 724.)  Notably absent from the ALJ's decision is any mention, much less discussion, relating these cursory findings, made by an internal medicine doctor without the benefit of a mental status examination, to any particular opinion by Dr. Michiel.  For instance, the ALJ did not explain how Plaintiff appearing "alert and interactive [] with a normal affect" contradicts Dr. Michiel's finding that Plaintiff is severely limited in his ability to maintain attention and concentration to carry out simple job instructions.  (*See* AR 25, 464.)  The ALJ "merely states" these observations "point toward an adverse conclusion" but "makes no effort to relate any of these" observations to "the specific medical opinions and findings he rejects."  *William H. v. Comm'r of Soc. Sec.*, No. 3:19-CV-6148-DWC, 2020 WL 5056451, at *7 (W.D. Wash. Aug. 27, 2020) (quoting *Embrey*, 849 F.2d at 421).  "This approach is inadequate."  *Id.*

Finally, regarding his work history, against which the persuasiveness of both doctors' opinions is measured, Plaintiff testified that in his work as a maintenance person at the mobile home facility, he does not lift more than five pounds and uses a golf cart to get around.  (AR 44, 54.)  According to Plaintiff, he works four hours a day, three of which is spent standing or walking. (AR 45.)  Plaintiff also testified that his current boss is not happy with his pace of work activity, which has caused conflict.  (AR 57.)  Although the ALJ bases his assessment of the persuasiveness of Dr. Caton's and Dr. Michiel's opinions in part on the fact that Plaintiff "is currently working as a maintenance person at a mobile home park," the ALJ makes no mention that the work is performed in the limited and accommodated manner described by Plaintiff.  *See, e.g., Susan C. v. Kijakazi*, No. 20-CV-04324-TSH, 2021 WL 4553585, at *5 (N.D. Cal. Oct. 5, 2021) (finding error where "[t]he ALJ's decision offers no explanation for how [the plaintiff's] part-time, assisted work activity is inconsistent with Dr. Wilson's limitations which . . . were assessed in the context of a full-time, mandatory work schedule.") *cf. Estrella v. Colvin*, 174 F. Supp. 3d 1090, 1105 (D. Ariz.

2016) (ALJ erroneously relied opinion evidence based on Plaintiff's work history that failed to discuss or mention that such work was "done under special conditions.")  Yet even if Plaintiff's work was exactly was as the ALJ described—"pulling weeds, picking up trash, and tending to the swimming pool" (AR 24, 25)—the ALJ does not explain how these activities translate to an RFC assessment whereby Plaintiff is deemed able to, for example, lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for about six hours each in an eight-hour workday; and occasionally reach overhead with his dominant upper extremity (AR 21).  *See, e.g., Eric J. G. v. Saul*, No. CV 20-91-M-KLD, 2021 WL 1186972, at *6 (D. Mont. Mar. 30, 2021) (ALJ erred in finding opinion unpersuasive as inconsistent with Plaintiff's work history as they failed to specify how the work was inconsistent with the medical opinion, such that the ALJ's conclusory determination "does not come close" to a detailed and thorough summary of the facts and conflicting clinical evidence, stating ALJ's interpretation thereof, and making findings, *i.e.*, "legally sufficient reasons supported by substantial evidence for finding a medical opinion unpersuasive"); *see also William H.*, 2020 WL 5056451, at *7.

The Court is aware of the general proposition that ALJ's are to resolve ambiguities and conflicts in the record.  *Ford*, 950 F.3d at 1154.  It is also mindful of the deference desired by the agency in promulgating these new regulations.  *See* REVISIONS TO RULES, 82 Fed. Reg. 5844-01 at *5860 ("[The new regulations are] essential for [the agency's] administration of a massive and complex nationwide disability program where the need for efficiency is self-evident.").  However, the text of the regulations explicitly requires an explanation of how the ALJ considered the supportability and consistency of an opinion.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  Harmonizing this requirement with current Ninth Circuit law prohibiting cherry-picking and requiring a detailed and thorough summary of conflicting evidence, and an interpretation and findings thereon, the ALJ must explicitly address evidence that supports and is consistent with a less-than-persuasive medical opinions, and should this evidence fail to persuade, the ALJ must provide legally sufficient reasons.  *See Buethe*, 2021 WL 196620, at *7; *Jones v. Saul*, No. 2:19-CV-01273 AC, 2021 WL 620475, at *8 (E.D. Cal. Feb. 17, 2021) (the ALJ cannot "forego articulation of their reason or reasons altogether"); *see also Lambert v. Saul*, 980 F.3d 1266, 1277

(9th Cir. 2020) ("[T]he ALJ must provide sufficient reasoning that allows [for] review."). This the ALJ did not do.

As to the ultimate outcome of Plaintiff's claim, the Court expresses no opinion as to the level of persuasiveness that should be ascribed to Dr. Caton's or Dr. Michiel's opinions. Nor does the Court express what Plaintiff's RFC ultimately should be. These are for the ALJ to decide. *Ford*, 950 F.3d at 1154. However, because the ALJ cherry-picked facts and failed to link those facts when resolving the medical opinions, "the proper remedy is remand, where the ALJ may either (a) reaffirm [their] decision after a more thorough explanation of why these opinions were unsupported by and inconsistent with the relevant evidence, or (b) award benefits." *Buethe*, 2021 WL 1966202, at *7.

## V.    CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Patrick William Gonzales and against Defendant Kilolo Kijakazi, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __January 27, 2022__                      _____*/s/ Sheila K. Oberto*_____
                                                                    UNITED STATES MAGISTRATE JUDGE